IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANGELICA WOODS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:21-cv-00462 |
| ) | |
| CITY OF ST. LOUIS, MO, a municipal ) | JURY TRIAL REQUESTED |
| corporation, and ) | |
| ) | |
| JAMES (JAMIE) WILSON, in his ) | |
| Individual and official capacities, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

### PARTIES & JURISDICTION

1. Plaintiff, Angelica Woods (hereinafter "Woods") is an individual who lives in St. Louis, Missouri in the Eastern Division of the Eastern District of Missouri. She was employed by the City of St. Louis in the Towing Service Division of the Street Department until her wrongful discharge on or about February 4, 2021.

2. Defendant City of St. Louis (hereinafter "City") is a charter city organized and existing under the laws of the State of Missouri, located in the Eastern Division of the Eastern District of Missouri.

3. Defendant James (Jamie) Wilson (hereinafter "Wilson") is and was at all times relevant herein the Director of the Department of Streets for the City of St. Louis. He is sued in his individual and official capacities.

4. This action is brought pursuant to 42 U.S.C. §1983 and the First Amendment to the United States Constitution, as well as Ordinance 70847. This Court has jurisdiction over this

action pursuant to 28 U.S.C. §1331. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. §1367.

5. Plaintiff requests a jury trial pursuant to Federal Rule of Civil Procedure 38(b).

6. Venue is proper in the Eastern Division of the Eastern District of Missouri pursuant to 28 U.S.C. §1391(b) because all Defendants reside therein and all of the events complained of herein occurred within the Eastern Division of the Eastern District of Missouri.

## FACTS COMMON TO ALL COUNTS

7. Woods was employed by the City of St. Louis for over 23 years until her wrongful discharge. She originally worked in the City's Division of Corrections until she suffered a line of duty injury. As a result of this injury, she was wrongfully terminated by the City but was ordered reinstated by its Civil Service Commission.

8. After her reinstatement, in April 2020, Woods was assigned to the Towing Service Division and more specifically the City's tow lot as a Clerk Typist because her line of duty injury prevented her from working in the Division of Corrections.

9. The City's towing services have been plagued with scandal for years. In 2009, a retired city police officer was charged with defrauding vehicle owners, lien holders, and buyers when vehicles were towed by a company under contract with the St. Louis Police Department.

10. In 2014, City employees at the city's tow lot were charged with stealing personal property from vehicles being stored on the lot.

11. In June 2019, KMOV reported that a stolen car that ended up at the City's tow lot was found at the home of a tow lot employee and that cars that were supposed to be crushed for scrap were being removed from the lot, among other things. This misconduct was reported to the City by a tow lot employee and State Senator.

2

12.     The tow lot employee who reported this misconduct to the City and local media was retaliated against by Defendants when he was moved from the Streets Division and assigned to another City department because he "talked too much."

13.     In December 2019, the City hired a commissioner of the towing division to supervise the City tow lot.  When he reported similar misconduct, to include but not be limited to missing cars and files to Defendant Wilson and others, he was fired without explanation.

14.     Shortly after Woods began working at the City tow lot in April 2020, other tow lot employees began telling her she could get cheap cars for herself, family members, and friends at the City tow lot. Woods made it clear that she was not interested in participating in what she suspected to be improper/illegal conduct at the City tow lot.

15.     Woods began reporting unsafe and suspected illegal activity to her supervisors, at the time not knowing that when previous employees had reported similar misconduct, they had been retaliated against as set forth above.

16.     By way of example, Woods reported to her supervisors that co-workers at the tow lot were not wearing masks in the office, as required, and not practicing social distancing, even when co-workers suspected they might have Covid.  Additionally, during a time when access was supposed to be restricted in the office due to Covid, friends and family members of tow lot employees were coming into the office without masks.  When the boyfriend of an employee and others allowed into the office tested positive for Covid, no one was quarantined.  When Woods questioned this, she was told City tow could not shut down because employees were exposed to Covid.   Because Woods is a single mother with three children, two who are disabled, it was of particular concern to her that co-workers at the City tow lot were not following the requirements the City imposed on other businesses during the pandemic.

3

17.     Woods also reported altercations that were taking place at the City tow lot between employees because they made her feel unsafe.

18.     Additionally, but without waiver of the foregoing, on or about November 18, 2020, Woods reported to Kent Flake, Commissioner of Streets, that co-workers at the tow lot were: overcharging tow fees; misusing City time (not working while on the clock); sleeping on the job; falsifying documents by putting no name or a false address on documents when cars were purchased from the tow lot; towing and storing personal vehicles on the tow lot, and doing private tows while dispatched calls were waiting.  She also reported that cars were being removed from the tow lot after hours. Woods reported that several people, who did not work for the City, were going through City tow lot files looking for vehicles and later purchasing them. These same individuals would go into the key room to get car keys to inspect vehicles on the lot. Woods also reported that a specific individual was attending auctions and placing the highest bid to purchase a vehicle but that the price was changed and lowered when he actually paid for it. She reported some of these vehicles were then being transferred to tow lot employees.

19.     Shortly after reporting this misconduct to Flake, co-workers at the tow lot started calling Woods a snitch and subjecting her to a hostile work environment in an effort to force Woods to quit or provoke her so that she would be fired.

20.     The hostile work environment resulted in Woods requesting FMLA leave for stress from November 25, 2020 to December 11, 2020.

21.     Additionally, Woods spoke to Wilson in December 2020  about  people coming into the office that did not work there; employees sleeping on the job and misusing time; cars being removed after hours; falsifying documents; towing and storing personal vehicles on the tow lot; people coming to reclaim their cars when they were already gone and the person stating

4

they were never notified their car was at the tow lot; police officers being stranded when their police cars broke down because drivers would not answer these priority calls; police officers getting courtesy tows of their private vehicles; and supervisors making up rules because there were no written policies or procedures, which were needed at the tow lot, among other things. Wilson simply responded that he would talk to Flake but nothing changed, except employee's personal vehicles were removed from the tow lot.

22. After Woods spoke to Wilson to harassment at the tow lot increased.

23. Beginning in October 2020, Woods begin reporting this misconduct to the St. Louis Comptroller's Office and began providing information to it about the fraud and other financial improprieties she believed to be taking place at the City tow lot. Additionally, Woods reported this misconduct to the Mayor's Office, the Director of Operations, and the Personnel Department.

24. On or about January 19, 2021, Woods through counsel, complained about the hostile work environment she was suffering in retaliation for reporting misconduct at the City tow lot pursuant to the City's Whistleblower Ordinance.

25. On or about January 21, 2021, Woods was notified that the City intended to fire her, and a pretermination review was scheduled before Defendant Wilson, who had previously retaliated against two other tow lot employees when they dared to report this misconduct. Even though the allegations against Woods dated to November and December 2020, and were known to Defendant Wilson because of grievances Woods had filed, he did act to terminate Woods until he learned that Woods had reported misconduct at the City tow lot to the Comptroller's Office.

26. On February 1, 2021 Woods (with counsel) met with Defendant Wilson for the purported pretermination review, even though it was clear he could not be a fair and impartial

5

decisionmaker based upon his removal of other whistleblowers assigned to the tow lot to protect those engaging in the misconduct.  In addition to defending the allegations made against her that were being used to justify her termination, Woods informed Defendant Wilson that because the City was doing nothing about her reports of misconduct, she had gone to the media about it. Defendant Wilson admitted that he was aware of this media contact because before the pretermination review, KSDK had contacted him about a story it planned to air before the pretermination review.

27. During this meeting, Defendant Wilson made the incredible claim that he was unfamiliar with the allegations that Woods had reported to the City and media, even though Woods had reported this misconduct to Wilson and his direct report, Flake.

28. On February 4, 2021, KSDK reported that the problems that triggered a police investigation in 2019 continued to be present at the City tow lot, to include but not be limited to allegations made by Woods that cars were leaving the tow lot with no money being paid for them and cars being "sold" to buyers without a valid name or address.

29. In the same KSDK interview, the fired tow lot commissioner stated that there were too many vehicles and too many files missing to be a mistake and that it was the citizens of St. Louis who were being scammed.

30. In this same KSDK interview, Flake admitted that cars should not be leaving the City tow lot for free.

31. The KSDK story in which Woods participated led to the disclosure of other misconduct at the City tow lot, to include but not be limited to owner's of stolen cars being charged for the return of their vehicles in violation of City Ordinance.

32. The next day, February 5, 2021, Defendant Wilson terminated Woods for

6

pretextual reasons, just as he had retaliated against the two previous tow lot employees who dared to report misconduct at the City tow lot.

33. Upon information and belief, Defendant Wilson's wrongful termination of Woods was designed and intended to send a message to other City employees, and more specifically other City tow lot employees, that they better not report serious misconduct involving the tow lot because the City of St. Louis is more interested in covering up this misconduct and protecting the wrongdoers than correcting it.

34. On or about March 19, 2021, a City audit of the tow lot conducted by the Comptroller's Office confirmed claims reported by Woods.

35. On or about March 23, 2021, KSDK reported that the audit confirmed what Woods told KSDK: that nicer vehicles intentionally were not auctioned as they were supposed to be.

36. As a direct and proximate result of the acts of the Defendants, Woods has sustained and will continue to sustain lost wages and other benefits of employment, to include but not be limited to lost pension benefits.

37. As a direct and proximate result of the acts of the Defendants, Woods has incurred attorney's fees related to defending against the effort to terminate her.

38. As a direct and proximate result of the acts of the Defendants, Woods has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress and loss of personal and professional reputation.

**COUNT I**
**42 U.S.C. SECTION 1983 VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS - WHISTLEBLOWER**

7

For Count I of Plaintiff's cause of action against Defendants, she states as follows:

39. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of her Complaint.

40. Woods was retaliated against by Defendants when she was terminated based upon the exercise of her First Amendment right to speak as a private citizen about matters of public concern as set forth above.

41. Woods' speech was a motivating factor and/or played a part in the Defendants' decision to terminate her.

42. Woods' constitutionally protected interest in her right to speak about matters of public concern outweighs any interests Defendants might have had in preventing such speech.

43. Woods' protected speech, which was made at a reasonable time and in a reasonable manner when she was not working, did not render the running of the Towing Service Division inefficient and did not disrupt its operations in any way.

44. Woods' termination was an adverse employment action in which the Defendants named herein participated, explicitly or tactility authorized, approved, and/or ratified, and/or to which they showed a reckless indifference, while acting under color of state law.

45. Woods' termination was an action taken under color of state law by Defendants and violated her rights secured by the First Amendment to the United States Constitution made applicable to the states by the Fourteenth Amendment.

46. As a direct and proximate result of the acts of the Defendants set forth herein, Woods has sustained and will continue to sustain lost wages and other benefits of employment, to include but not necessarily limited to lost pension benefits.

47. As a direct and proximate result of the acts of the Defendants, Woods has

8

incurred attorney's fees related to defending against the effort to terminate her.

48. As a direct and proximate result of the acts of the Defendants, Woods has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of personal and professional reputation.

49. The conduct of Defendant Wilson as set forth herein was wanton, willful, and showed a reckless indifference to Woods' First Amendment rights, justifying an award of punitive damages against him in his individual capacity so as to punish him and to deter him and others from engaging in similar misconduct in the future.

WHEREFORE, Plaintiff Woods prays this Court to enter judgment in her favor and against Defendants and thereafter:

A. Order these Defendants to make Plaintiff whole for any and all losses or damages she has sustained and will continue to sustain in the future, including lost wages and other benefits of employment and attorney's fees related to her efforts to defend against her wrongful termination;

B. Award damages to Plaintiff for her emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of reputation;

C. Award Plaintiff punitive damages against Defendant Wilson in his individual capacity in such sum as this court believes will serve to punish him and to deter him and others from like conduct;

D. Award Plaintiff the costs of this action, together with her reasonable attorneys' fees; and

9

E. Grant such other relief as may appear to the Court to be equitable and just under the circumstances.

## COUNT II
## PRIVATE RIGHT OF ACTION CREATED BY CITY ORDINANCE

For Count II of Plaintiff's cause of action against Defendant City of St. Louis, she states as follows:

50. Plaintiff incorporates by reference as if fully set forth herein all preceding paragraphs of her Complaint.

51. Defendant City's termination of Plaintiff violates Ordinance 70847, the City's Whistleblower Law, which prohibits an employee from being retaliated against for engaging in protected activity under the Ordinance.

52. Plaintiff engaged in protected activity under Ordinance 70847 when she reported fraud and other financial impropriety to the Comptroller's Office and others as set forth above. Plaintiff also engaged in protected activity when she reported the violation of this Ordinance to the Department of Personnel.

53. Ordinance 70847 protects a class of persons, whistleblowers, from retaliation through adverse employment actions to include but not be limited to the adverse employment actions Woods suffered to include but not be limited to dismissal, an unsatisfactory employment evaluation, verbal abuse, intimidation and a hostile work environment because she took action protected by the Ordinance.

54. Ordinance 70847 provides the following remedies to employees subjected to an adverse employment action for reporting improper government action: restitution, reinstatement, and/or reimbursement for lost wages or expenses incurred, among others.  The ordinance also provides that "[n]othing in this Ordinance shall prohibit an employee from pursuing his or her

own private action to seek damages or other remedies beyond those awarded by the City."

55. A remedy is appropriate and necessary to promote the primary purpose of Ordinance 70847 and needed to ensure the effectiveness of this Ordinance because Defendant City is protecting those who have retaliated against Woods, not Woods as required by Ordinance 70847.

56. This court should afford a remedy to Woods by recognizing a private right of action to enforce Ordinance 70847, which the Ordinance itself recognizes.

57. Missouri courts recognize the common law principle that where there is a right, there is a remedy. Therefore, when a legislative enactment confers a special benefit on a class, members of that class have a right to bring a cause of action to enforce the right/benefit.

58. Ordinance 70847 was designed to specifically protect City employees, like Woods who expose fraud and other financial improprieties from retaliation like the retaliation she suffered. Therefore, Woods has a right to bring a private cause of action to enforce the rights conferred upon her and other City employees by Ordinance 70847, otherwise Ordinance 70847 is meaningless, as the City has shown that it does not intend to enforce it.

59. When Woods reported misconduct at the City tow lot to the Comptroller's Office, she was told she would be protected by Defendant City by reasons of Ordinance 70847, but she has not been.

60. As a direct and proximate result of the acts of the Defendant City set forth herein, Woods has sustained and will continue to sustain lost wages and other benefits of employment, to include but not necessarily limited to lost pension benefits.

61. As a direct and proximate result of the acts of Defendant City, Woods has incurred attorney's fees related to defending against the effort to terminate her.

62. As a direct and proximate result of the acts of the Defendants, Woods has suffered and will continue to suffer emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of personal and professional reputation.

WHEREFORE, Plaintiff Woods prays this Court to enter judgment in her favor and against Defendant City of St. Louis and thereafter:

A. Order this Defendant to make Plaintiff whole for any and all losses or damages she has sustained and will continue to sustain in the future, including lost wages and other benefits of employment and attorney's fees related to her efforts to defend against her wrongful termination;

B. Award damages to Plaintiff for her emotional pain and suffering, mental anguish, inconvenience, humiliation, embarrassment, loss of enjoyment of life, stress, and loss of reputation;

C. Award Plaintiff the costs of this action, together with her reasonable attorneys' fees; and

D. Grant such other relief as may appear to the Court to be equitable and just under the circumstances.

Respectfully submitted,

PLEBAN & PETRUSKA LAW, LLC.

by:     /s/ Lynette M. Petruska
Lynette M. Petruska #41212
lpetruska@plebanlaw.com
J.C. Pleban #63166
jc@plebanlaw.com
2010 S. Big Bend Blvd.
St. Louis, MO 63117
Telephone:  314-645-6666
Facsimile:  314-645-7376

Attorneys for Plaintiff