UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ANGELICA WOODS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:21 CV 462 CDP |
| | ) | |
| CITY OF ST. LOUIS, MO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Angelica Woods alleges that she was wrongfully discharged from employment with the City of St. Louis after she reported misconduct at the City's tow lot to, among others, the media.  Plaintiff was anonymously quoted in a KSDK news article which was posted online on February 4, 2021, and she was also anonymously interviewed on camera for a televised news report which aired the same day.  The next day, plaintiff was fired.  Plaintiff brings a 42 U.S.C. § 1983 claim for violation of the First Amendment against her former boss James Wilson (then the City of St. Louis' Director of the Department of Streets) and a Family Medical Leave Act (FMLA) claim against the City of St. Louis.

Defendants now seek summary judgment on both counts of the complaint, alleging that there is no evidence that plaintiff was fired for exercising her first amendment rights or that she was retaliated against for exercising her FMLA

rights.  While plaintiff cannot demonstrate that she was fired in retaliation for exercising her FMLA rights, her FMLA claim is broader than that sole allegation and defendant has not moved for summary judgment with respect to any of the remaining allegations.  Therefore, those aspects of plaintiff's FMLA claim remain pending and will proceed to trial.  Moreover, whether or not plaintiff was fired for exercising her first amendment rights must be decided by a jury.  Accordingly, defendant Wilson's motion will be denied in its entirety and the City's motion for summary judgment is granted only as to the FMLA termination allegation.  My analysis follows.

Standards Governing Summary Judgment

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).  I must view the evidence in the light most favorable to the nonmoving party and accord her the benefit of all reasonable inferences.  *Scott v. Harris,* 550 U.S. 372, 379 (2007).  My function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of informing the Court of the basis of its motion and demonstrating the absence of an issue for trial. *Celotex Corp.*, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party must either proffer evidence in the record that demonstrates a genuine issue of material fact or show that the moving party's proffer does not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248; *Conseco Life Ins. Co. v. Williams,* 620 F.3d 902, 910 (8th Cir. 2010); *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 800-01 (8th Cir. 2004). The substantive law determines which facts are critical and which are irrelevant. *Anderson*, 477 U.S. at 248. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.*

In determining a motion for summary judgment, I consider only those facts that can be supported by admissible evidence. Fed. R. Civ. P. 56(c); *Woods v. Wills*, 400 F. Supp. 2d 1145, 1175-76 (E.D. Mo. 2005). Testimony that would not be admissible is ignored. *Shaver v. Independent Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003). Accordingly, speculation, personal opinion, and legal conclusions are not "facts" upon which a party may rely for summary judgment purposes. *See Benford v. Grisham*, No. 1:18CV5 JMB, 2020 WL 569871 (E.D. Mo. Feb. 20, 2020). Under these standards I review the facts of this case.

Background Facts[1]

Plaintiff was a long-time City employee.  In 1997 she began working for the City as a corrections officer until she was transferred to the City's tow lot in April of 2020.  She remained there as a clerk typist until her termination on February 5, 2021.  As a clerk typist, plaintiff dispatched tow trucks around the City and then completed and inputted the necessary paperwork into the computer system to document the tow service.  When plaintiff began working at the tow lot, Kent Flake was in charge of the tow lot[2] and was plaintiff's supervisor.  Defendant Wilson[3] was the head of the street department (which included the tow lot division) in his position as the City of St. Louis' Director of the Department of Streets.  He made the decision to terminate plaintiff.  As for immediate supervisors, plaintiff reported to Edwin Young and then began reporting to Steve Estopare in June of 2020.

Plaintiff immediately began experiencing problems at the tow lot.  Plaintiff claims that shortly after she started other tow lot employees told her that she could get cheap cars for herself and family members from the tow lot by changing the

---

[1] These factual findings are for summary judgment purposes only, and neither party may rely on this Memorandum and Order to establish any fact at trial.

[2] Flake was the Commissioner of the Street Division (one of the divisions within the street department) and was assigned management duties over the tow division, which did not have a Commissioner at that time.

[3] Wilson became the Commissioner of Traffic in early 2021.

4

price and getting a new title.  Plaintiff observed a tow lot employee save a 2017 Toyota (which was purchased for only 200 dollars despite no issues) for someone at Brock's Auto Parts.  Plaintiff also observed a non-tow lot employee going into the office to look for cars with keys and titles.  Plaintiff also claims that tow lot employees got personal tows and stored their cars on the lot and that drivers showed up for work at 3:00 p.m. but signed in at 1:30 p.m.  Plaintiff alleges that she reported these activities to Young in June and to Flake in November but that nothing was done.  Instead, plaintiff claims that she was targeted for retaliation by her supervisors and her coworkers.

Plaintiff had a phone call with Flake on November 18, 2020 during which she again reported that non-tow lot employees continued to come into the office and look through the city's files to cherry pick the best cars on the lot.  She told him that when a customer came to collect her stolen 2015 Jeep Compass with all the paperwork she was told it was not registered, but then tow lot employee Cheryl Pogue contacted a friend about the Jeep and it was sold to her friend for $1,400.  Plaintiff also told Flake that Pogue was falsifying tow records by not recording the necessary information when a car was purchased at auction.  Instead, addresses and names were either left blank or recorded with obviously false information such as "*9999 unknown, St. Louis, MO 99999" for the buyer's address.  Plaintiff also told Flake that Pogue and others falsified bills of sale for cars bought at auction.  A

buyer would place the highest bid at auction to purchase the vehicle but then tow lot employees would lower the price when the buyer actually paid for the vehicle. Some of these vehicles were then transferred to tow lot employees. Plaintiff also reported that employees would disappear while tow calls were waiting and continued to request personal tows. After the phone call, plaintiff testified that her coworkers began referring to her as a snitch and that she was excluded from conversations and activities, such as group lunches.

A few days later, on November 24, 2020, plaintiff received a call from St. Louis City police detective Alexander Evans. He informed her that someone at city tow had contacted him about her secretly recording a meeting involving Young in which she was not a participant. Plaintiff denied the allegation.[4] Plaintiff alleges that her supervisors did not discuss this allegation with her and that Flake denied making this report to the police when she questioned him about it. However, plaintiff believes that Young asked Flake to initiate the police investigation because of their close personal relationship. No further action was taken by the police department respecting this alleged surreptitious recording.[5]

---

[4] Plaintiff testified that she was simply using the fax machine as part of her routine job duties and put her phone down in the process. There is apparently video footage of the incident which was reviewed by Wilson as part of the pre-termination review, but that video has not been made a part of the record.

[5] Plaintiff filed a complaint against Evans over the incident but it was never resolved.

Plaintiff claims that on that same day, an irate customer came to the tow office with a police officer complaining that tow lot employees had stolen a bag out of her car.  Plaintiff claims the customer and officer were being helped by Pogue, not her, and that she merely responded from her desk that "they heard all the time [about] people getting items stolen out of their car."  Plaintiff testified that she never advised the customer to contact the police and she never suggested that the bag was stolen by tow lot employees.  Plaintiff further testified that when she later saw a report written by the officer describing the incident differently, she was shocked and contacted the officer directly.  Plaintiff testified that the officer stated that he was instructed to write the report by Young.  The "report" is an email from the officer to Young and appears in the record as ECF 69-5.  The officer's report was forwarded to Flake from Young and states that "dispatch went out to the callers vehicle and told her the Cheryl and Aarron had the ba[g].  Dispatch also gave her a piece of paper with the number 314-647-3570 and an unknown name on it.  Caller stated the dispatcher told her to call the police and to call the number in the morning.  The dispatcher also advised us that the employees take things from the vehicles on the lot all the time."  Plaintiff was understood to be the dispatcher referred to in the email.

Plaintiff also took her complaints about workplace misconduct and illegal activities to defendant Wilson.  She sent him emails and a letter in December of

2020 and also spoke to him about unauthorized non-tow lot employees coming into the tow lot office to look through files for cars and change tow tickets with the assistance of tow lot supervisors, employees misusing City time by sleeping on the job, cars being removed after hours, falsified documents, employees receiving personal tows and storing personal vehicles on the tow lot, customers complaining that they were never notified that their vehicle was at the tow lot and then discovering that their vehicle had been sold when they came to reclaim it, tow drivers refusing to answer tow calls, courtesy tows of private vehicles for employees and police officers, and supervisors making up rules.  ECF 76-4, 76-5, 76-12.

Beginning in October of 2020, plaintiff also contacted the St. Louis City Comptroller,[6] Darlene Green, and her office to report fraud and other financial improprieties she believed were taking place at the tow lot.  Plaintiff also emailed Green about these issues on November 25 and December 3, 2020.   ECF 76-6, 76-7.  Plaintiff's complaints to Green include "overcharging for tow fees, employees misusing city time, falsifying documents, workplace violence, and sleeping on the job."  ECF 76-6.  She also reported to Green that non-tow lot employees were being given access to tow lot records by Pogue to look for the best vehicles to

---

[6] The Comptroller is an elected official who serves as the City's Chief Fiscal Officer and directs the fiscal affairs of the City.

purchase at auction.  ECF 76-6.  Wilson admits that he was made aware of

plaintiff's complaints to the comptroller's office by the city counselor's office

sometime in December of 2020.

Plaintiff filed her first grievance related to the tow lot on November 1, 2020.

She complained that Pogue was unprofessional and yelled at her.  She accused

Pogue of slandering her name, attempting to provoke her, and showing favoritism.

Plaintiff's grievance was "not substantiated" by Flake.  Flake directed plaintiff to

discuss the problem with her immediate supervisor.  She was also told that

"occurrences similar to this one seem to be happening a lot at City Tow and you

have been present during several of them in your short tenure at the Tow Lot.  All

employees of the City should thoroughly read the City's Code of Conduct when

then sign it so that they understand that the work atmosphere should be

professional and courteous."   ECF 69-13.  Flake's response also states that "your

grievance mentions that you have observed alleged wrong doing.  Any 'wrong

doing' that is not reported is just as bad as the 'wrong doing' itself.  In order to fix

the 'wrong doing' it needs to be brought to the forefront so that it can be stopped

by Towing Services Management, Street Department Management, City of Saint

Louis Management, City of Saint Louis Metropolitan Police Department or State

and Federal Authorities."  ECF 69-13.  Wilson further responded to plaintiff's

grievance by sending her a letter on December 18, 2020, claiming that he was

9

unsure what "wrongdoing" she was referring to and threatening her with discipline if she failed to report misconduct to management.  ECF 69-14.

Plaintiff also emailed Sylvia Donelson, the City's employee relations manager in the Department of Personnel, in November of 2020 to report workplace violence, a hostile work environment, and that tow lot employees were not adhering to COVID-19 protocols.  ECF 76-8.  In December of 2020, she emailed Donelson again informing her that she had documentation of city tow lot employees falsifying time sheets, providing private tows, and changing car information for their personal benefit.  She also told Donelson about drivers padding their time sheets and employees storing personal vehicles on the lot. Plaintiff reported that Estopare warned Pogue and Lott that plaintiff was a snitch. The email concludes with a statement that supporting documentation is enclosed, but the exhibit filed with the Court contains no attachments.  ECF 76-9.

On December 11, 2020, plaintiff submitted FMLA paperwork for intermittent FMLA leave due to stress for the period November 25, 2020 to December of 2021.  Plaintiff's FMLA leave was approved on December 26, 2020. Prior to approval, plaintiff was told that she failed to file all the appropriate paperwork.  Plaintiff responded by accusing Estopare of retaliating against her by only providing her with some of the necessary paperwork.  ECF 76-14.

10

On December 17, 2020, plaintiff received a six month employee service rating from Young and Estopare.  She received unsuccessful ratings in the categories of judgment, interpersonal skills, and work habits.  She was rated successful in the areas of customer service, productivity, quality, and safety.  Her overall performance rating was successful.  Plaintiff was rated unsuccessful in the area of interpersonal skills as a result of two verbal encounters with co-workers that eventually required supervisory intervention.  It was noted that plaintiff had difficulty getting along with her co-workers and "continues to state that she has information of illicit activities at City Tow; however, she has refused to divulge that information to her supervisor.  Instead of coming to work and doing her job, plaintiff tries to find issues with City Tow creating a negative working environment."  ECF 69-3 at 5.  Plaintiff's supervisors also claimed that she "does not exercise discretion" and will "gossip/spread rumors about City Tow/Staff to anyone that will listen" and that she frequently calls in sick at the last minute.  ECF 69-3 at 5.  In response, plaintiff noted on her evaluation that the justifications for her unsuccessful ratings were false, stating that she had not been the subject of any disciplinary action.  Instead, plaintiff claimed that her negative performance evaluation was due to the grievances she filed as well as her reporting fraudulent activities.  ECF 69-3 at 4.  Plaintiff's statement concludes with a note to "see

11

attached form," but defendants have failed to provide plaintiff's attached form as part of the exhibit.

On December 29, 2020, plaintiff filed a grievance stating that fellow tow lot employee Shonnell Stayton sang an annoying song towards her, implied that plaintiff was a snitch, and created a hostile work environment for her. Plaintiff's grievance was denied for failing to first report her complaints to her supervisor.

On December 31, 2020, plaintiff was working at the tow lot. She testified that at some point after her arrival she requested her FMLA leave because of stress but Estopare denied it. Later that day, she and Stayton were involved in a heated dispute which was captured on a cell phone by Pogue.[7] This footage has been filed with – and reviewed by – this Court. ECF 69-7. The recording begins with audio footage of two women screaming at each other. Estopare heads into a room to break up the fight, but Pogue stops him by saying that he should "stop stopping [plaintiff]." Plaintiff shouts at Stayton that she is "gender confused. You don't know if you have a penis or a vagina." Stayton refers to plaintiff as "Stay Puft" in reference to plaintiff's size and calls plaintiff a bitch several times. Stayton is being restrained by a male employee and has removed one of her boots[8] and says

---

[7] Plaintiff alleges that Pogue then widely disseminated this video to tow lot employees to embarrass and harass her.

[8] Plaintiff testified that Stayton removed her boot because she wanted to fight her. The audio recording is at times unintelligible so this Court was unable to verify that allegation, but despite

that plaintiff needs to leave.  Plaintiff begins shouting that she is a long-time city employee and isn't going anywhere as another female employee steps between them.  Stayton then tells plaintiff that she needs to schedule another surgery for weight loss.  This entire confrontation is witnessed by Estopare, who suddenly announces that plaintiff has to leave and her pay will be docked.  He does not address Stayton at all or send her home on the video.[9]  Plaintiff is belligerent and challenges Estopare, asking why she is the only one being asked to leave and accusing him of retaliation and wrongdoing.  Estopare accuses plaintiff of creating havoc and then calls the police to remove plaintiff, hanging up the phone only after plaintiff leaves.

Plaintiff filed two grievances against Estopare and one against Stayton relating to this incident.  Plaintiff's grievance regarding Estopare's docking of her pay was sustained and her pay was restored on January 15, 2021.

On January 15, 2021, plaintiff filed a grievance stating that Young was yelling and creating a hostile working environment for employees, including her.  After investigation it was determined that Young's tone was harsh and he was spoken to about the incident.

---

Wilson's testimony to the contrary, Stayton did remove one of her boots during the confrontation.

[9] Although it was later claimed that Stayton was also sent home and disciplined for this incident, defendants have not presented any documentation verifying this alleged discipline.

Five days later on January 20, 2021, plaintiff received a pre-termination

review notice from Wilson, who oversaw the pre-termination review and made the

decision to terminate plaintiff.  ECF 69-4.  The letter states in pertinent part as

follows:

> The City of St. Louis Street Department – Towing Service Division is
> considering your dismissal for the following reasons:
>
> On November 17, 2020 you illegally wiretapped/eavesdropped when you
> attempted to record a supervisor's meeting at City Tow of which you were
> not a participant.  This is in direct violation of Missouri State Statute
> 542.402 and the Code of Conduct.
>
> On November 24, 2020 you were involved with providing information to a
> customer at City Tow which resulted in the police being called due to your
> false allegation and misinformation that two tow lot employees stole a duffle
> bag out of a customer's vehicle.  Once investigated the bag was found to be
> seized by the Saint Louis Metropolitan Police Department because it
> contained contraband.  This is a direct violation of the City's Code of
> Conduct specifically the Honesty subsection.
>
> On December 31, 2020 at City Tow you were involved in a verbal
> altercation with another employee of City Tow, Ms. Stayton.  During this
> altercation with Ms. Stayton you stated towards her "You gender confused,
> you don't know if you have a vagina or a penis."  You also charged at Ms.
> Stayton.
>
> This behavior is also in violation of Administrative Regulation 142—the
> policy of Workplace Violence that states specifically that "Employees are
> expected to treat citizens, members of the public, customers, co-workers . . .
> . with courtesy and respect."  It also specifically forbids "hostile behavior
> including belittling, abusing or bullying behaviors."  This action also
> violated Administrative Regulation 113 which specifically states that
> harassment based on "sex, sexual orientation or gender identity or
> expression" is prohibited.

> The Code of Conduct states that City Employees are responsible for: "Contributing to a workplace attitude that respects the standards and behaviors promoted by this code." "City Employees must be completely honest in their dealings with the public or other employees. Lying in any form, omitting some facts or exaggeration undermines the fundamental trust that must exist between employer and employee and has no place in public service."
>
> Administrative Regulation 117 specifically states that any violation which is so serious that continued employment in the agency would pose a threat to the patients, clients, employees, visitors, or public confidence in and the well-being of the agency is unacceptable and may be grounds for termination.
>
> The following are also exceptions to progressive discipline: Violations of Administrate Regulation 113 and 142 and "The commission of any act while on duty or off duty which would be a violation of Federal, State or local law, other than minor traffic violations. This does not mean that a conviction or even an arrest need have occurred for such a violation."
>
> Your prior work record may be considered.
>
> The purpose of the Pre-Termination Review is to afford you the opportunity to respond to the charges, review any evidence against you, and present any evidence on your behalf, including any mitigating circumstances. You may have a representative present at the review.

ECF 69-4 at 1-2.   Plaintiff hired attorney Lynette Petruska to represent her, and Petruska sent Wilson a letter accusing the City of retaliating against plaintiff and other whistleblowers and referring specifically to plaintiff's reports of wrongdoing. ECF 76-10.

On February 1, 2021, Petruska met with Wilson for plaintiff's pre-termination review hearing. The parties dispute whether plaintiff and her counsel

contested any of the charges levelled against plaintiff during the review hearing. However Wilson admits that Petruska informed him that plaintiff was assisting news reporters from KSDK with an investigation into illegal activities at the tow lot.  ECF 76-2 at 7.

On February 4, 2021, KSDK published a news article about improprieties at the tow lot and aired a newscast regarding the same.  ECF 69-21, 81.  Plaintiff is not identified by name in the news article, but she is anonymously quoted as saying that tow lot employees "know how to go in there and change the numbers and the name."  ECF 69-21 at 4.  This quote refers to the allegation that cars were being redeemed from the tow lot without money being paid to the City.   The anonymous source (plaintiff) is identified as a current tow employee who was working with KDSK to dissect more than a hundred pages of tow lot records.  ECF 69-21 at 4.

The newscast begins with a "confirmation" from the St. Louis Circuit Attorney's office that an investigation into the city tow low "is underway . . . after [the newcast's] investigation uncovered a paper trail of missing money and questionable practices."  ECF 81.   The tow lot is described as a place where cars are never seen again if towed there.  The newscast states that "several" tow lot employees have reported suspicious activity at the tow lot to the City and to KSDK. The reporter describes how the tow lot is supposed to operate, but then goes on to state that it does not actually operate that way.  The newscast then cuts to plaintiff,

who is shown only in silhouette.  Her identity is withheld and a voice modulator

distorts her voice when she talks on camera because she "fears retaliation."[10]

Plaintiff repeats her statement from the news article that employees "know how to

go in there and change the numbers and the name."  The reporter then states that

plaintiff worked with the news team to "dissect hundreds of pages" of tow lot

records, which revealed that in 2019, 155 cars were marked as "redeemed" but no

money was paid to the City and no buyer was properly identified.  The records

shown on camera were recorded by Pogue.  The reporter calculates that, if plaintiff

is correct, the records demonstrate that the City was owed $77,860 for these cars but

it was never collected.

The news report then references prior complaints of misconduct at the tow lot,

including a police investigation from 2019 about cars disappearing from the tow lot

without proper payment made.  Onscreen, sentences from the police report are

highlighted and enlarged, including a statement that Brock's Auto Parts and

Recycling collected cars (allegedly for salvage) with no money being paid.[11]  State

senator Karla May appears in the newscast, stating that she has heard about

mismanagement at the city tow lot from several tow lot employees.  In 2019, May

---

[10] Although plaintiff claims that she is recognizable from her silhouette, this issue is not material
for summary judgment purposes because Wilson already knew (through his conversation with
plaintiff's counsel) that it was plaintiff on the newscast.

[11] Plaintiff observed a tow lot employee save a 2017 Toyota (which was purchased for only 200
dollars despite no issues) for someone at Brock's.

urged the St. Louis City Mayor's Office to launch an investigation into improprieties at the tow lot, and the Mayor forwarded her letter to the police unit investigating the missing vehicles.  May reiterated plaintiff's allegations that cars were disappearing or held over with no money being paid to the City.  Flake also appears in the newscast and states that cars should not be leaving the tow lot for free.  Flake refers to an audit and claims that there was no wrongdoing found.  The reporter states that the news team is still waiting for the audit reports.  Flake claims that after the police investigation in 2019, the tow lot made changes to its daily operations, including using a third-party auctioneer and installing cameras in the tow lot and offices. Flake admitted, however, that the tow lot did not have a written manual of standard operating procedures.  The report concludes with a statement that the 2019 police investigation is still "ongoing" and encourages anyone who had a "questionable experience" with the tow lot to contact KSDK.

The next day, February 5, 2021, plaintiff was fired.

Discussion

§ 1983 claim

Plaintiff alleges that she was fired by Wilson in retaliation for reporting misconduct at the tow lot to City officials and the media.

The First Amendment restrains a government employer from retaliating against a public employee based on the employee's speech.  *Wingate v. Gage*

18

*County Sch. Dist., No. 34,* 528 F.3d 1074, 1080–81 (8th Cir. 2008).  To establish a *prima facie* case of First Amendment retaliation, plaintiff must show that "(1) she engaged in activity protected by the First Amendment; (2) the defendant took an adverse employment action against her; and (3) the protected conduct was a substantial or motivating factor in the defendant's decision to take the adverse employment action." *Wilson v. Miller*, 821 F.3d 963, 967–68 (8th Cir. 2016) (cleaned up).  Whether the protected activity was a substantial or motivating factor in an employment decision is a question of fact, but the sufficiency of the evidence to create an issue of fact for the jury is a question of law.  *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008).

To avoid summary judgment, plaintiff must either present direct evidence of retaliation or follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Williams v. Tucker*, 857 F.3d 765, 768 (8th Cir. 2017).  Direct evidence must be strong enough to show a specific link between the alleged discriminatory animus and the challenged decision sufficient to support a finding that an illegitimate criterion actually motivated the employment decision.  *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 965 (8th Cir. 2006).  Under the *McDonnell Douglas* burden shifting framework, plaintiff must set forth a *prima facie* case in order to shift the burden of producing a legitimate, non-retaliatory reason for the employment decision to the

19

employer.  *Williams*, 857 F.3d at 768.  If the employer provides a non-retaliatory reason, then the employee must prove that the reason is a pretext for the retaliation. *Id.*

To determine whether plaintiff's speech is protected, the Court must first determine whether she "spoke as a citizen on a matter of public concern." *Hemminghaus v. Missouri*, 756 F.3d 1100, 1110 (8th Cir. 2014) (cleaned up).  If she did not, then her claim must fail "because no protected speech is at issue." *Marlow v. City of Clarendon*, 78 F.4th 410, 418 (8th Cir. 2023) (cleaned up). If she did, then plaintiff's "right to comment on matters of public concern must next be balanced with the employer's interest in promoting the efficiency of the public services it performs through its employees." *Id.* (cleaned up).

The threshold question is whether plaintiff spoke in her capacity as a private citizen on a matter of public concern.  *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  If she shows that, "the possibility of a First Amendment claim arises." *Id.* For plaintiff to prevail, the Court must conclude that her speech was not made "pursuant to [her] official duties." *Id.* at 421.  "Speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Lyons v. Vaught*, 875 F.3d 1168, 1174 (8th Cir. 2017) (cleaned up).  "The critical question is whether the speech at issue is itself ordinarily within the scope of an employee's

duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228 (2014) (cleaned up).

Plaintiff's job as a clerk typist required her to dispatch tow trucks around the City and then complete the necessary paperwork to document the tow service. It did not require her report financial improprieties or other illegal activities to Green or to the media.[12] "Speech that involves a matter of political, social or other concern to the community is of public concern." *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1117 (8th Cir. 1997). The Court has no trouble concluding that plaintiff engaged in protected speech by reporting illegal activities at the tow lot to Comptroller Green (activities which were then reported by Green's office to the city counselor's office, which in turn told Wilson about plaintiff's report) and by participating in KSDK's investigation into tow lot activities which led to an investigation of the tow lot by the St. Louis City Circuit Attorney's Office. That plaintiff also complained to her supervisors about matters of personal interest in does not negate her protected activity. Plaintiff has met her burden to establish that she engaged in activity protected by the First Amendment.

---

[12] While plaintiff was told by Wilson that she was required to report wrongdoing to her supervisors, she has presented sufficient evidence that she did, in fact, report wrongdoing on multiple occasions to multiple supervisors, including Wilson. Moreover, there is no dispute that Green was not plaintiff's supervisor or within the chain of command at the tow lot.

Wilson does not dispute that termination is an adverse action and therefore satisfies the second prong of the *prima facie* test.

Instead, Wilson spends the bulk of his summary judgment motion arguing that he had good reasons for terminating plaintiff that were unrelated to her protected activity.  As the Eighth Circuit Court of Appeals acknowledges, whether plaintiff's protected activity was a substantial or motivating factor in an employment decision is a question of fact: this Court must only decide if there is sufficient evidence to create an issue of fact for the jury to decide.  *Morris*, 512 F.3d at 1018.  In this case, there undoubtedly is.

Temporal proximity between protected activity and an adverse employment action can contribute to establishing the third element of a *prima facie* case of retaliation.  *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 657 (8th Cir. 2007); *Hudson v. Norris,* 227 F.3d 1051,1053 (8th Cir. 2000) (plaintiff's "exemplary" record in combination with the large number of adverse employment actions which took place within four months of the protected conduct, was sufficient to allow "a reasonable jury to infer a causal link between [the two].").  An adverse action that occurs on the heels of protected activity "is significant evidence that what happened was more than just coincidence."  *Id.* at 1051 (cleaned up).  While temporal proximity alone cannot establish retaliatory motive, *see Skalsky v. Independent School Dist. No. 743*, 772 F.3d 1126, 1131 (8th Cir.

2014), "the order and temporal proximity of [the challenged employment action and the protected activity] should not be regarded as coincidental on a motion for summary judgment." *Stever v. Independent School District No. 625*. 943 F.2d 845, 852 (8th Cir. 1991).

Here, plaintiff has adduced sufficient evidence which, if believed, would permit a rational factfinder to conclude that plaintiff was terminated in retaliation for contacting Green's office about financial improprieties and illegal activity at the tow lot and for her participation in the KSDK newscast. Wilson admitted that he knew that plaintiff had contacted Green's office before he sent her pre-termination letter, and he was told about the newscast by plaintiff's lawyer in her pre-termination hearing, which was held three days before the newscast aired. The day after the newscast aired, plaintiff was fired. The immediate temporal proximity between the newscast and plaintiff's firing cannot be regarded as coincidental in this case. It will be up to a jury to weigh the credibility of witnesses and decide if defendant's version of the story – that the reasons listed in plaintiff's pre-termination letter were the true reasons for her discharge – is true or if he actually fired plaintiff for exercising her first amendment rights to report illegal activities at the tow lot to City officials and the media. While Wilson characterized plaintiff's conduct as violative of City regulations, a rational jury may well conclude after consideration of all the evidence that plaintiff's actions

were not as described by Wilson in the pre-termination letter and that the purported

reasons were merely a manufactured pretext to dismiss her because of her

protected activity.  In reviewing all the evidence surrounding plaintiff's discharge,

the jury may also consider evidence of plaintiff's repeated complaints to her

supervisors about the same illegal conduct and their reaction (or rather, inaction) in

response to her complaints, as well as evidence that plaintiff was repeatedly

referred to as a "snitch" and subjected to retaliatory conduct after these complaints

were made.

Because there is sufficient evidence from which a jury could find that

plaintiff's protected activity was a substantial or motivating factor in Wilson's

decision to terminate her, his motion for summary judgment must be denied.

Wilson also argues that he is entitled to qualified immunity on plaintiff's §

1983 claim because he did not violate clearly established law.  As a government

official, Wilson is entitled to qualified immunity unless: (1) his conduct violated a

constitutional right, and (2) that right was clearly established.  *Williams v. Mannis*,

889 F.3d 926, 931 (8th Cir. 2018) (citations omitted).  A right is "clearly

established" when "[t]he contours of the right [are] sufficiently clear that a

reasonable official would understand that what he is doing violates that right."  *Id.*

(alterations in original) (citations omitted).  "Although [the United States Supreme]

Court's case law does not require a case directly on point for a right to be clearly

established, existing precedent must have placed the statutory or constitutional question beyond debate.  The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7-8 (2021) (cleaned up).

The only basis for Wilson's assertion of immunity is that plaintiff did not make a submissible case of retaliation.  Because I conclude that plaintiff has made a submissible case of retaliation, defendant is not entitled to qualified immunity on plaintiff's claim against him.  To the extent Wilson's argument is construed as one that the right is not clearly established, it is rejected as it is "beyond debate" that the First Amendment guarantees every citizen a right to engage in free speech, without governmental restriction. *Wickersham v. City of Columbia,* 481 F.3d 591, 597 (8th Cir. 2007).  A public employer may not penalize an employee for the exercise of her constitutionally protected right to freedom of speech, because "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti,* 547 U.S. at 417; *see also McGee v. Pub. Water Supply, Dist. No. 2 of Jefferson Cnty., Mo.,* 471 F.3d 918, 919 (8th Cir. 2006). Rather, "[a] public employee retains a degree of First Amendment protection when she speaks as a citizen addressing matters of public concern." *Bonn v. City of Omaha,* 623 F.3d 587, 592 (8th Cir. 2010).  Because a reasonable official would have understood that he could not fire plaintiff for talking to the Comptroller and

the press about illegal activities in the tow office, Wilson is not entitled to qualified

immunity on plaintiff's First Amendment retaliation claim.

FMLA Claim

Plaintiff also brings a claim against the City that her FMLA rights were

violated.  The FMLA entitles an eligible employee to 12 workweeks of leave

during a 12-month period if she has a "serious health condition that makes the

employee unable to perform the functions of the position of such employee."  29

U.S.C. § 2612(a)(1)(D).   A "serious health condition" is any "illness, injury,

impairment, or physical or mental condition that involves (A) inpatient care in a

hospital, hospice, or residential medical care facility; or (B) continuing treatment

by a health care provider."  29 U.S.C. § 2611(11).   The FMLA "makes it unlawful

for an employer to 'interfere with, restrain, or deny the exercise of or the attempt to

exercise' rights provided under the FMLA."  *Pulczinski v. Trinity Structural*

*Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (quoting 29 U.S.C. § 2615(a)(2)).

It also makes it unlawful for "any employer to discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful" by

the FMLA.  29 U.S.C. § 2615(a)(2).

"There are three types of claims arising under the FMLA: (1) where an

employer refuses to authorize leave under the FMLA or takes other action to avoid

responsibilities under the Act (an entitlement or interference claim); (2) where an

employee opposes any practice made unlawful under the FMLA and the employer retaliates against the employee (a retaliation claim); and (3) where an employer takes adverse action against an employee because the employee exercises rights to which she is entitled under the FMLA (a discrimination claim)." *Boston v. TrialCard, Inc.*, 75 F.4th 861, 868 (8th Cir. 2023) (citing *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005-06 (8th Cir. 2012)).

In her amended complaint, plaintiff alleges that "defendant intentionally engaged in unlawful employment practices in violation of FMLA, including retaliating against her, including terminating her, for exercising her rights under the FMLA." ECF 49 at 11. Plaintiff also alleges that "defendants subjected plaintiff to a hostile work environment due to [her] requests for medical leave, complaints regarding the harassment and violation of [her] rights under the FMLA." ECF 49 at 11. In opposition to summary judgment she makes the following argument to support her FMLA claims:

> Plaintiff's supervisor, Kent Flake, Commissioner of Streets, held up plaintiff's FMLA paperwork for three weeks. Plaintiff stated in her email to Kent Flake on December 17, 2020 that she had only received three (3) pages from Steve Estopare in retaliation. Plaintiff stated that she had forwarded the Family Medical Leave paperwork three (3) weeks ago and they were just now informing her that it's incomplete. In addition, plaintiff was denied use of her FMLA on December 31, 2020 in retaliation. Plaintiff was retaliated against for utilizing her Family Medical Leave.

ECF 75 at 11 (cleaned up).

It is unclear whether plaintiff is attempting to assert an entitlement claim or a discrimination claim with respect to her allegation regarding the "hold up" with processing her paperwork, but either claim fails because "the FMLA provides no relief unless the employee has been prejudiced by the violation." *Pulczinksi*, 691 F.3d at 1006 (quoting *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Thus, plaintiff must show that a rational juror could find, for example, that she was "denied compensation or benefits," or that she was "deterred" from taking FMLA leave to which she was otherwise entitled. *Id.* at 1007. Plaintiff offers no evidence or argument to support such a claim here. The undisputed facts demonstrate that plaintiff requested FMLA leave on December 11, 2020 for the period of November 25, 2020 to December 2021. Plaintiff's request was approved on December 26, 2020. Plaintiff provides no evidence or argument that she sought and was denied or was otherwise deterred from seeking FMLA leave while her paperwork was being processed, or that she was forced to take unpaid leave for a medical reason because her FMLA leave had not been approved. Because no rational juror could conclude that plaintiff was prejudiced by any alleged delay (if fifteen days could even be considered a delay) in processing her FMLA paperwork, any FMLA claim based on those facts must fail.

Nor is it clear whether plaintiff is attempting to assert an entitlement claim with respect to her allegation that she requested, but was denied, FMLA leave on

December 31, 2020.  In her deposition, plaintiff testified that, after she was

approved to take intermittent FMLA leave for stress, she asked Estopare on

December 31, 2020 if she could take her FMLA leave and go home because she

felt anxious.  ECF 76-1 at 49.  Plaintiff alleges that Estopare told her, "No."  ECF

76-1 at 49.  Later that day, plaintiff had an altercation with Stayton which resulted

in her being sent home without pay.  After plaintiff submitted a grievance on the

issue, she was paid for the time sent home.  ECF 76-19.

An employer is prohibited from interfering with, restraining, or denying an

employee's exercise of or attempted exercised of any right contained in the FMLA.

29 U.S.C. § 2615(a)(1).  Interference includes "not only refusing to authorize

FMLA leave, but discouraging an employee from using such leave.  It would also

include manipulation by a covered employer to avoid responsibilities under

FMLA."  29 C.F.R. § 825.220(b).  "An employer's action that deters an employee

from participating in protected activities constitutes an interference or restraint of

the employee's exercise of his rights."  *Stallings v. Hussmann Corp*., 447 F.3d

1041, 1050–51 (8th Cir. 2006) (cleaned up).  "A violation of this provision creates

what is commonly known as the interference theory of recovery."  *Throneberry v.*

*McGehee Desha County Hosp.,* 403 F.3d 972, 977 (8th Cir. 2005).  "When an

employer attaches negative consequences to the exercise of protected rights, it has

chilled the employee's willingness to exercise those rights because he or she does not want to be fired or disciplined for doing so." *Stallings,* 447 F.3d at 1050.

In an interference claim, an "employee must show only that he or she was entitled to the benefit denied." *Stallings,* 447 F.3d at 1050.   The Eighth Circuit has recognized that an employee can prove interference if she was denied substantive rights under the FMLA for a reason connected with her FMLA leave, regardless of the employer's intent. *Throneberry,* 403 F.3d at 979.

The Eighth Circuit acknowledges that "confusion often arises as to whether an employee's FMLA claim is really about interference with his substantive rights, not discrimination or retaliation." *Stallings,* 447 F.3d at 1051 (cleaned up).  The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent.  *Id.*  "Although in some circumstances, a given set of facts will fall clearly into either (a)(1) or (a)(2), it appears that the lines between the two categories are not hard and fast." *Id.* (cleaned up).

The City has not addressed this allegation in its summary judgment briefing, categorizing plaintiff's FMLA claim as one exclusively for retaliatory termination. That argument does not demonstrate that the City is entitled to judgment as a matter of law on Count II in its entirety because plaintiff has made a submissible

case that she exercised her FMLA rights by requesting to take her FMLA leave on December 31, 2020, but her supervisor denied her request.  Construing the facts in the light most favorable to plaintiff, a rational jury could find in plaintiff's favor on a claim that the City interfered with her FMLA rights by denying her request to exercise her FMLA-approved leave on December 31, 2020.  That is all that is required to defeat summary judgment, so the City is not entitled to judgment as a matter of law on that aspect of plaintiff's FMLA claim.[13]

The same, however, cannot be said for plaintiff's FMLA retaliatory discharge claim.  "Whether characterized as a 'discrimination' claim under § 2615(a)(1), or as a 'retaliation' claim under § 2615(a)(2), the Court requires proof of the employer's discriminatory intent."  *Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013) (cleaned up).  Such "proof may come from direct evidence or indirect evidence using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework."  *Id.* (cleaned up).

Plaintiff offers no direct evidence of discrimination or retaliation for this aspect of her claim.  Thus, she must rely on indirect evidence under the *McDonnell Douglas* burden-shifting framework, which requires the employee to establish a

---

[13] Similarly, a rational jury may also find that plaintiff was subjected to discrimination, a hostile work environment, and/or retaliation for her attempted exercise of her statutorily protected rights because she was later sent home without pay by the same supervisor after he accused her of wreaking havoc, called the police on her, and sent her home without pay.  In any case, it remains true that the City is not entitled to summary judgment on this claim.

*prima facie* case, with the burden then shifting first to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action, then back again to the employee to demonstrate that the employer's proffered reason is pretextual. *Mitchell v. Iowa Prot. & Advoc. Servs., Inc.*, 325 F.3d 1011, 1013 (8th Cir. 2003). The elements of a *prima facie* case for both discrimination and retaliation are essentially the same. Compare *Pulczinski*, 691 F.3d at 1007 ("To establish a *prima facie* case of FMLA discrimination, an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action."), with *Scruggs v. Pulaski Cnty.*, 817 F.3d 1087, 1094 (8th Cir. 2016) (holding that, to establish a *prima facie* case of FMLA retaliation, an employee must show that: (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity) (cleaned up).

Here, the only evidence plaintiff offers of a causal connection between her termination and the exercise of her rights under FMLA is her subjective belief that she was fired in retaliation for the exercise of her FMLA rights. Plaintiff cannot make a *prima facie* case based solely on her subjective beliefs, however sincerely held. *See Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) ("Mere

allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.").  Unlike the evidence discussed above in connection with her first amendment retaliation claim, there is no evidence of a causal connection between plaintiff's termination on February 5, 2021, and the exercise of her FMLA rights on December 31, 2020.  Plaintiff's grievance regarding her pay status for that day was resolved (with her pay being restored) five days before she received her pre-termination letter.  Plaintiff offers no evidence or argument that her FMLA rights were mentioned by her supervisors after she was denied FMLA leave on December 31, 2020, nor does she contend that her FMLA leave was raised by Wilson during her pre-termination hearing (or at any other point).  Plaintiff cannot simply testify that she was "retaliated against" and evade summary judgment without any evidence supporting a causal connection between her protected FMLA activity (which is distinct from her first amendment activity) and her termination.  The City is entitled to summary judgment on that aspect of plaintiff's FMLA claim only. The rest of her FMLA claim will proceed to trial.

Finally, I urge the parties to continue their good faith efforts to settle this case, as a trial will be costly, time-consuming, and may not provide a favorable outcome to any party involved.

Accordingly,

**IT IS HEREBY ORDERED** that the motion for summary judgment filed by defendant Wilson [68-1] is denied, and the motion for summary judgment filed by defendant City of St. Louis [68-2] is granted only to the termination claim asserted in Count II, but is denied in all other respects.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of November, 2023.